## BASIC INFORMATION

### 1. Why did I get this notice package?

You or someone in your family or an entity you represent may have purchased Providian common stock during the period from June 6, 2001 through and including October 18, 2001. If you or someone in your family or an entity you represent did purchase Providian common stock during this period, you are a member of the Class.

The Court directed that this Settlement Notice be sent to you because you have a right to know about a proposed settlement of a class action lawsuit, and about all of your options, before the Court decides whether to approve the settlement. If the Court approves it and after objections and appeals are resolved, an administrator appointed by the Court will make the payments that the settlement allows.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Northern District of California, San Francisco Division, and the case is known as *In re Providian Financial Corp. Securities Litigation*, No. C-01-3952-CRB. The people who sued are called the Plaintiffs, and the Company and the persons that were sued, Providian Financial Corp., David Alvarez, Shailesh J. Mehta, James Rowe and David J. Petrini[1], are called the Defendants. Mssrs. Alvarez, Mehta, Rowe and Petrini are the Individual Defendants.

### 2. What is this lawsuit about?

Providian is engaged in the business of lending money to people through the issuance of credit cards. The lawsuit claimed that Providian misled investors about its current financial condition and future prospects by making false and misleading statements to securities analysts and in its press releases and financial statements filed with the Securities and Exchange Commission, in alleged violation of the federal securities laws. Defendants deny they did anything wrong. The Court did not decide which side was right. But both sides agreed to the settlement to ensure a resolution and to provide benefits to Class Members.

### 3. Why is this a class action?

In a class action, one or more people called Class Representatives (in this case Retirement Systems of Alabama, the Lead Plaintiff), sue on behalf of people who have similar claims. All these people are a Class or Class Members. One court resolves the issues for all Class Members, except for those who timely and validly exclude themselves from the Class. This case was assigned to Judge Charles R. Breyer of the United States District Court for the Northern District of California, San Francisco Division.

### 4. Why is there a settlement?

The Court did not decide in favor of Lead Plaintiff or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the risks and cost of a trial, and the people affected will get compensation. The Class Representative and the attorneys support the settlement, believe it is fair and reasonable given the risks involved in this complex litigation and believe that the settlement is in the best interests of the Class.

## WHO IS IN THE SETTLEMENT

To see if you will get money from this settlement, you first have to decide if you are a Class Member.

### 5. How do I know if I am part of the settlement?

The Court decided that everyone who fits this description is a Class Member: *all persons who purchased or otherwise acquired Providian common stock during the period from June 6, 2001 through and including October 18, 2001.*

### 6. Are there exceptions to being included?

You are not a Class Member if you are one of the following: (i) Defendants; (ii) members of the immediate families of each Individual Defendant; (iii) any entity in which any Defendant has or had a controlling interest; (iv) any person who was an officer or director of Providian or its subsidiaries or affiliates during the Class Period including members of the immediate families of such persons; (v) the legal representatives, heirs, successors or assigns of any such excluded party; and (vi) you previously excluded yourself or "opted out" of the Class by filing a timely and valid request for exclusion.

---

[1] Plaintiffs also sued David Alvarez, but the Court dismissed Mr. Alvarez from the suit pursuant to Mr. Alvarez's motion for summary judgment.

financial advisors, personal or legal representatives, analysts, agents, associates, servants, insurers, co-insurers and reinsurers, predecessors, successors, parents, subsidiaries, divisions, assigns, joint ventures and joint venturers, spouses, heirs, executors, administrators, related or affiliated entities, members of an Individual Defendant's immediate family, and any trust of which any Defendant is the settlor or which is for the benefit of any Individual Defendant and/or member(s) of his family, and all other Persons.

All of the Court's orders will apply to you and legally bind you.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

When the Court determined that this case could proceed as a class action, a notice was sent out to all members of the Class. At that time, you were given the opportunity of excluding yourself, or "opting out" of the Class. If you notified the Claims Administrator, Gilardi & Co., LLC, that you did not want to be part of the class action, you are excluded from the settlement. If you did not already send in this notification, you are part of the Class for purposes of this settlement and need to complete the Proof of Claim and Release to receive a distribution from the Net Settlement Fund. It is too late to exclude yourself from the Class now, but you still have the opportunity to object to the Settlement. If you choose to object to the settlement, you need to read pages 8 - 9 of this Settlement Notice to find out the steps to notify the Court of your objection to the Settlement.

### 13. What if I previously excluded myself from the Settlement?

If you previously excluded yourself from the Settlement, do not send in a claim form to ask for any money. But, you may sue, continue to sue, or be part of a different lawsuit against Providian and the Individual Defendants.

## THE LAWYERS REPRESENTING YOU

### 14. Do I have a lawyer in this case?

The law firm that represented Lead Plaintiff, Retirement Systems of Alabama, in this litigation and was approved by the Court as Plaintiffs' Lead Counsel, Chitwood & Harley, LLP of Atlanta, Georgia, will represent you and the other Class Members. These lawyers are called Plaintiffs' Lead Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense. Plaintiffs' Lead Counsel are available to answer questions you may have concerning your Proof of Claim or concerning any notice that you may receive from the claims administrator, after the claims administrator reviews your submission.

Please note, Plaintiffs' Lead Counsel cannot represent you if you chose to exclude yourself and initiate your own action against Providian and/or the Individual Defendants.

### 15. How will the lawyers be paid?

Plaintiffs' Lead Counsel are requesting that the Court award attorneys' fees from the Gross Settlement Fund in an amount not greater than fourteen percent (14%) of the Gross Settlement Fund and for reimbursement of expenses (including an award of expenses and lost wages on behalf of Lead Plaintiff) up to a maximum amount of $2,000,000, plus interest at the same rate as earned by the Gross Settlement Fund. Plaintiffs' Lead Counsel intend to file a joint petition with the Court on behalf of all Plaintiffs' Counsel who were involved in the lawsuit and on behalf of Lead Plaintiff. Plaintiffs' Lead Counsel, without further notice to the Class, may subsequently apply to the Court for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the members of the Class and any proceedings subsequent to the Settlement Fairness Hearing.

## OBJECTING TO THE SETTLEMENT, THE MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND THE PLAN OF ALLOCATION

You can tell the Court that you don't agree with the settlement or some part of it.

### 16. How do I tell the Court that I don't like the settlement, the amount of attorneys' fees and expenses requested, and/or the plan of allocation?

If you're a Class Member, you can object to the settlement, the amount of attorneys' fees and expenses requested and the plan of allocation. You can give reasons why you think the Court should not approve the settlement, the amount of attorneys' fees and expenses requested and/or the plan of allocation. The Court will consider your views. To object, you must send a letter saying that you object to *In re Providian Financial Corp. Securities Litigation*, No. C-01-3952-CRB. Be sure to include your name, address, telephone number, your signature and the reasons you object. You also must give evidence that you are a Class Member, including the number of shares of Providian common stock you purchased and sold during the Class Period. Mail the objection to these three different places postmarked no later than September 10, 2004.

8

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN RE ENTERASYS NETWORKS, INC.
SECURITIES LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

No. C-02-071-M

**NOTICE OF PENDENCY OF CLASS ACTION, PROPOSED SETTLEMENT THEREOF, FINAL APPROVAL HEARING AND RIGHT TO SHARE IN SETTLEMENT FUND**

TO: ALL PERSONS AND ENTITIES WHO PURCHASED THE COMMON STOCK OF CABLETRON SYSTEMS, INC. BETWEEN JUNE 28, 2000 THROUGH AND INCLUDING AUGUST 3, 2001 AND ALL PERSONS AND ENTITIES WHO PURCHASED THE COMMON STOCK OF ENTERASYS NETWORKS, INC. BETWEEN AUGUST 6, 2001 THROUGH AND INCLUDING FEBRUARY 1, 2002, AND WHO SUFFERED DAMAGES THEREBY.

**PLEASE READ THIS NOTICE CAREFULLY**

THIS NOTICE RELATES TO A PENDING CLASS ACTION AND A PROPOSED SETTLEMENT OF THIS ACTION AND CONTAINS IMPORTANT INFORMATION AS TO YOUR RIGHTS TO OBTAIN A SHARE OF THE SETTLEMENT AS FURTHER DESCRIBED BELOW.

**YOU ARE HEREBY NOTIFIED**, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and an Order of the United States District Court for the District of New Hampshire (the "Court"), that there is pending in the Court a series of class actions that have been consolidated into one action (the "Action") against defendants Enterasys Networks, Inc. ("Enterasys" or the "Company"), Enrique P. Fiallo, Robert J. Gagalis, Piyush Patel and David Kirkpatrick (collectively, the "Defendants") on behalf of all persons and entities who purchased the common stock of Cabletron between June 28, 2000 through and including August 3, 2001, and all persons and entities who purchased the common stock of Enterasys between August 6, 2001 and February 1, 2002, and who suffered damages thereby (the "Class"). Excluded from the Class are: (1) the Defendants and the current officers and/or directors of Enterasys; (2) any individuals who were officers and/or directors of Enterasys during the Class Period; (3) any individuals who were officers and/or directors of any entity in which Enterasys has or had a controlling interest or is or was a parent or subsidiary of or is or was controlled by Enterasys during the Class Period; (4) the members of the immediate families of the individuals identified in the preceding three subparagraphs; (5) any entity in which Enterasys has or had a controlling interest or is or was a parent or subsidiary of or is or was controlled by Enterasys during the class period; and, (6) the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest and/or assigns of any such excluded party. Also excluded from the Class are any Persons who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Notice.

The Action alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5. The Action alleges, *inter alia*, that Defendants engaged in an intentional and pervasive accounting fraud that spanned nearly two fiscal years and overstated Cabletron's and Enterasys' financial results in violation of Generally Accepted Accounting Principles. Defendants deny all allegations of wrongdoing in the Action, and deny any liability for the claims asserted in the Action.

**YOU ARE FURTHER NOTIFIED** that, pursuant to the Federal Rules of Civil Procedure, the Court certified the Class (except those members thereof, if any, who file a valid, timely Request for Exclusion) for settlement purposes. This Notice is not intended to be, and should not be construed as, an expression of any opinion by the Court with respect to the truth of the allegations in the Action or the merits of the claims or defenses asserted. This Notice is to advise you of the pendency of the Action, the proposed settlement thereof (the "Settlement"), and of your rights hereunder.

**I. STATEMENT OF THE CLASS' RECOVERY AND POTENTIAL OUTCOME OF THE CASE**

The Lead Plaintiff, Los Angeles County Employees Retirement Association ("LACERA"), has negotiated a Settlement that creates a fund in the amount of $50,000,000 consisting of $17,000,000 in cash together with all interest accrued and paid thereon, and $33,000,000 worth of Enterasys common stock. The number of shares of Enterasys common stock is to be calculated by determining the average closing price on the New York Stock Exchange for Enterasys common stock for the ten (10) trading days prior to the date of the Final Approval Hearing and dividing $33,000,000 by said average trading price (the "Settlement Fund"). Enterasys also executed a promissory note to the Class in the sum of $33,000,000 to secure distribution of the common stock to the Class.

Lead Plaintiff also negotiated extensive corporate governance provisions that Enterasys shall adopt within thirty (30) days of the Order and Final Judgment of the Settlement. *See* Section III below.

Based on Lead Plaintiff's estimate of the number of shares entitled to participate in the Settlement and the anticipated number of claims to be submitted by Class members, the average distribution per share would be

(d) The date of purchase or sale of common stock is the "contract" or "trade" date as distinguished from the "settlement" date.

(e) For Class members who received and exchanged multiple shares, the First-In-First-Out ("FIFO") accounting method shall be utilized for the purpose of matching purchases of stock with the sales. Transactions resulting in a gain shall not be included in the computation of Recognized Claims. The covering purchase of a short sale is not an eligible purchase.

(f) The purchase and sale price of stock does not include commissions or other charges for the purchase or sale of such stock.

(g) No payment will be made on any claim where the potential distribution is $10.00 or less, but the Authorized Claimant will otherwise be bound by the Final Judgment entered by the Court.

(h) No person shall have any claim against Plaintiffs' Counsel, the Claims Administrator or other agent designated by Lead Plaintiffs' counsel, any Defendant or Defendants' Counsel, based on the distribution made substantially in accordance with the Stipulation and the Settlement, the Plan of Allocation, or further orders of the Court. All Class members who fail to complete and file a valid and timely Proof of Claim shall be barred from participating in distributions from the Net Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound by all of the terms of the Stipulation, including the terms of the judgment entered and releases given.

If the Settlement is approved by the Court, the Court will enter a judgment which will dismiss the Action with prejudice against Defendants, and bar and permanently enjoin Lead Plaintiff and each Class member from prosecuting in any way the Settled Claims against Defendants or the other Releasees defined in the Stipulation. The Court shall retain jurisdiction over implementation of the Settlement, disposition of the Settlement Fund, hearing and determining Lead Plaintiff's Counsel's application for attorneys' fees, costs, interest, expenses (including fees and costs of experts and/or consultants), and enforcing and administering the Settlement, including any releases executed in connection therewith.

## IV. ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Lead Plaintiff's Counsel will apply to the Court at the Final Approval Hearing for reimbursement of litigation expenses and disbursements in the approximate amount of $200,000 and for an award of attorneys' fees of up to fifteen percent (15%) of the Settlement Fund after the deduction of litigation expenses and disbursements. The amount of attorneys' fees was negotiated at arms' length between the Lead Plaintiff and Lead Plaintiff's Counsel. Such an award as may be granted by the Court will be paid from the Settlement Fund.

## IV. NOTICE TO BANKS, BROKERS, AND OTHER NOMINEES

Banks, brokerage firms, institutions, and other persons, who, during the Class Period, purchased or sold Cabletron common stock or Enterasys common stock, shall, within ten (10) days of receipt of this Notice, provide the Claims Administrator with the following: (1) the names and addresses of each such beneficial owner, preferably on computer-generated mailing labels or, if there are more than 2,000 names and addresses, on a 32" diskette, CD-ROM or ZIP/JAZ media, or (2) forward a copy of this Notice to each such beneficial owner and provide the Claims Administrator with written confirmation that the Notice has been so forwarded. Additional copies may be obtained from the Claims Administrator for forwarding to such beneficial owners. All such requests should be **in writing**, as follows:

> Claims Administrator
> In Re Enterasys Networks, Inc. Securities Litigation
> c/o Strategic Claims Services
> 2710 Concord Road, Suite 5
> Aston, PA 19014
> Fax: (610) 364-2698
> Website: www.strategicclaims.org

## VI. THE RIGHTS OF CLASS MEMBERS

If you are a Class member, you may receive the benefit of, and you will be bound by, the terms of the Settlement described in Part III of this Notice, upon approval of the Settlement by the Court.

You may request to be excluded from the Class if you file a written request for exclusion with the Clerk of the United States District Court, 55 Pleasant Street, Concord, New Hampshire 03301 and mail a copy of such exclusion to: Claims Administrator, In Re Enterasys Networks, Inc. Securities Litigation, c/o Strategic Claims Services, 2710 Concord Road, Suite 5, Aston, PA 19014, in an envelope postmarked not later than December 9, 2003. Any requests for exclusion must indicate on the envelope "Request for Exclusion — In Re Enterasys Networks, Inc. Securities Litigation," must provide: (a) your name, address, telephone number; (b) the number of shares of Cabletron common stock purchased or otherwise acquired and sold between June 28, 2000 through and including August 3, 2001; (c) the number of shares of Enterasys common stock purchased or otherwise acquired and sold between August 6, 2001 through and including February 1, 2002; (d) the dates of and prices paid or received on all such purchases and sales; and (e) the

LEXSEE 2003 U.S. DIST. LEXIS 12651

In Re: MOTOROLA SECURITES LITIGATION

No. 03 C 287

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2003 U.S. Dist. LEXIS 12651; Fed. Sec. L. Rep. (CCH) P92,459

July 16, 2003, Decided
July 23, 2003, Docketed

**SUBSEQUENT HISTORY:** Claim dismissed by, Motion denied by, in part *In re Motorola Sec. Litig., 2004 U.S. Dist. LEXIS 16857* (N.D. Ill., Aug. 25, 2004)

**PRIOR HISTORY:** *Motorola Credit Corp. v. Uzan, 2003 U.S. Dist. LEXIS 9966* (S.D.N.Y., June 9, 2003)

**DISPOSITION:** [*1] New Jersey's motion for consolidation, appointment as lead plaintiff and appointment of Lite DePalma and Wolf Popper as lead co-counsel granted.

**LexisNexis(R) Headnotes**

**JUDGES:** REBECCA R. PALLMEYER, United States District Judge.

**OPINIONBY:** REBECCA R. PALLMEYER

**OPINION:**

MEMORANDUM OPINION AND ORDER

Pending before this court are nine related securities class actions filed on behalf of purchasers of Motorola, Inc. ("Motorola") securities. These actions allege that Motorola violated *Sections 10(b) and 20(a)* of the Securities Exchange Act of 1934, as well as *Rule 10b-5* promulgated by the Securities and Exchange Commission ("SEC"). The court has granted the parties' motions for a finding of relatedness, and all of the cases are hereby consolidated in this court pursuant to *15 U.S.C. § 78u-4(a)(3)(B)(ii)*. (Minute Order, No. 03 C 287, February 28, 2003.) The consolidated actions shall hereinafter be referred to as "*In re* Motorola Securities Litigation."

There are currently three plaintiffs with outstanding motions before this court for appointment as lead plaintiff, and appointment of their chosen counsel as lead counsel. n1 For the following reasons, the court grants New Jersey's motion [*2] for appointment as lead plaintiff, and approves New Jersey's choice of lead counsel in this matter.

n1 Two other plaintiffs, the City of Hialeah Police Chapter 185 Share Plan and a conglomerate of groups collectively termed the "MAPERS Funds" (consisting of the City of Westland Police and Fire Retirement System, City of Dearborn Heights Act 345 Police and Fire Retirement System, Waterford Township Police and Fire Retirement System, City of Roseville Employees Retirement System, and the Washtenaw County Employees Retirement System), earlier moved for appointment as lead counsel, but have subsequently withdrawn their motions and have indicated their support for the appointment of the State of New Jersey as lead plaintiff in this action. (Notice of Withdrawal of the Motion of the City of Hialeah Police Chapter 185 Share Plan to be Appointed Lead Counsel; Memorandum in Further Support of the Motion of the MAPERS Funds for Consolidation, Appointment as Lead Plaintiffs and for Approval of Selection of Lead and Liaison Counsel and in Opposition to the Other Motions.)

[*3]

Case 5:03-cv-04003-JAR-JPO    Document 148-4    Filed 08/11/05    Page 6 of 14

Page 2
2003 U.S. Dist. LEXIS 12651, *; Fed. Sec. L. Rep. (CCH) P92,459

## BACKGROUND

Plaintiff Stephen Frank filed this class action lawsuit on January 14, 2003 on behalf of purchasers of Motorola securities during the period of February 3, 2000 through April 6, 2001. (Complaint P 1.) Eight actions were subsequently filed in the Northern District of Illinois, in addition to seven related lawsuits filed in the Southern District of New York, and potentially others unknown to the court. (Transcript of Proceedings, *In re Koenemann*, S.D.N.Y., April 15, 2003, at 13.)

Motorola is headquartered in Schaumburg, Illinois, which lies within this court's district. The company has substantial national and international operations in the telecommunications, electronics, semiconductor, computer, and cable television industries. (Frank Complaint P 7.) Motorola common stock trades on the New York Stock Exchange, and approximately 2.3 billion shares are outstanding. (*Id.* P 16.)

In each of the nine cases before this court, the Plaintiffs' allegations relate to the sale of products and services by Motorola to Telsim Mobil Telekomunikayson Mizmetleri A.S. ("Telsim"), a Turkish company, for use by Telsim in developing a cellular telephone network in Turkey. [*4] n2 (Memorandum of Law in Support of the State of New Jersey's Motion for Consolidation, to be Appointed Lead Plaintiff and for Approval of its Selection of Lead Counsel, hereinafter "New Jersey's Memorandum," at 3-4.) According to the State of New Jersey, on February 3, 2000, Motorola issued a press release announcing a $ 1.5 billion agreement with Telsim to provide equipment, services, and infrastructure to expand Telsim's Global System for Mobile Communications network. (Frank Complaint P 21.) Plaintiffs allege that this announcement had a positive effect on Motorola's stock price, as its shares closed on February 3, 2000 at $ 50.92 per share, up from $ 48.21 the day before. (New Jersey's Memorandum, at 4.) Plaintiffs allege that Motorola continued over the next several months to issue press releases detailing its business with Telsim, which had the effect of further increasing the value of Motorola stock. (*Id.* at 4-5.)

n2 New Jersey has indicated that any discrepancy between the class periods of defendants in the various actions will be resolved upon the filing of a consolidated amended complaint. (Memorandum of Law in Support of the State of New Jersey's Motion for Consolidation, to be Appointed Lead Plaintiff and for Approval of its Selection of Lead Counsel, at 2, n.3.)

[*5] According to Plaintiffs, however, Defendants' public statements failed to disclose that Motorola itself was financing the deal with Telsim. The transactions with Telsim were predicated upon an approximately $ 2 billion vendor financing agreement provided by Motorola. (*Id.* at 5.) Plaintiffs claim that Motorola misled investors by failing to disclose numerous problems related to that loan, including Telsim's failure to insure repayment. (*Id.*) Plaintiffs also allege that Motorola improperly recognized revenue in connection with the Telsim transaction in violation of generally accepted accounting principles ("GAAP"). (*Id.*)

In its Proxy Statement filed with the SEC on March 30, 2001, Motorola disclosed for the first time, according to Plaintiffs, that out of a total of $ 2.8 billion in gross long-term finance receivables, Motorola had provided $ 1.7 billion in vendor financing to a single customer in Turkey, that is, Telsim. (Frank Complaint PP 33-34.) On April 6, 2001 (the last day of the purported class period), a *Bloomberg News* columnist published an analysis of Motorola's loan to Telsim and the related disclosures in the 2001 Proxy Statement. The analysis underscored [*6] the risk of non-recovery of the loan to Telsim. (New Jersey's Memorandum, at 6.) That day, Motorola shares declined by 23% from the previous day's close of $ 14.95 per share to $ 11.50 per share. (*Id.*) Telsim never repaid the Motorola loan, according to Plaintiffs, and Motorola filed a lawsuit against the Turkish company. (*Id.* at 6-7.) These circumstances led Plaintiffs to file the lawsuits against Motorola that are currently before the court.

Under the *Private Securities Litigation Reform Act of 1995* ("PSLRA"), the court must appoint a lead plaintiff in this case. *15 U.S.C. § 78u-4(a)(3)*. Plaintiff Stephen Frank n3 purchased shares of Motorola stock during the class period (February 3, 2000 to April 6, 2001), and alleges that he was damaged by Motorola's non-disclosures. (Frank Complaint P 6.) Frank filed a class action against Christopher Galvin, the Chairman of the Board and the Chief Executive Officer of Motorola during the class period, as well as other Motorola officials and the company itself. (Id. PP 7-11.) Similar actions were filed in the Southern District of New York, with the *Barry v. Koenemann* action's pendency noted in *Investors* [*7] *Business Daily* on December 31, 2002. Within 60 days thereafter, on March 3, 2003, Plaintiff Department of the Treasury of the State of New Jersey and its Division of Investment and Market Street Securities, Inc. ("New Jersey" or "the State") filed this motion seeking appointment as lead plaintiff. In addition, a group of class members referred to as the "Commerzbank Lead Plaintiffs" (hereinafter "Commerzbank"), consisting of class members Edward and Anna Mae Appell, Raymond Behvand, Country

Page 3

2003 U.S. Dist. LEXIS 12651, *; Fed. Sec. L. Rep. (CCH) P92,459

Trust Bank, Zohreh Jahingiri, Tom Livaditus, Village Park Association, and Commerzbank moved for appointment as lead plaintiff. In addition, the International Brotherhood of Teamsters Local 710 Pension Fund, Health and Welfare Fund, and Employees Pension Fund ("Local 710 Funds"), moved for appointment as lead plaintiff. Commerzbank advances several reasons, discussed below, why New Jersey is not an appropriate choice for lead plaintiff. The Local 710 Funds state that for the reasons set forth by Commerzbank, "it appears that the State of New Jersey may be subject to unique defenses and is not an adequate lead plaintiff." (The Local 710 Funds' Reply in Support of Their Motion to be Appointed Lead [*8] Plaintiff, at 1.) The Local 710 Funds also argue that Commerzbank is not a suitable lead plaintiff, and therefore suggest their appointment as lead plaintiff.

n3 Frank has not identified the date on which he purchased Motorola securities.

DISCUSSION

I. Appointment of Lead Plaintiff

Under the Private Securities Litigation Reform Act, *15 U.S.C. § 78u-4 et seq.*, presumptively, the lead plaintiff shall be the party with the largest financial interest in the relief sought by the class, assuming that person otherwise satisfies the requirements of *Federal Rule of Civil Procedure 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*. The presumption may be rebutted by a showing that this party will not fairly and adequately protect the interests of the class or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)*.

The purpose behind the PSLRA [*9] is to prevent "lawyer-driven" litigation, and to ensure that "'parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs [*sic*] counsel.'" *In re Oxford Health Plans, Inc., Securities Litigation, 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998)* (quoting H.R. Conf. Rep. No. 104-369). Congress believed this goal could best be achieved by encouraging institutional investors to serve as lead plaintiffs. *Id.* at 46 (citing H.R. Conf. Rep. No. 104-369.)

In this case, the party with by far the largest financial interest is an institutional investor, the State of New Jersey, which alleges that its losses in Motorola common stock and debentures during the class period were $ 14.35 million. This figure is about three and a half times the alleged losses of $ 3.9 million claimed by Commerzbank and much more than the $ 1.52 million claimed by the Local 710 Funds, the two other plaintiffs seeking lead plaintiff status.

The PSLRA states that in addition to having a financial stake, the lead plaintiff must also [*10] satisfy the requirements of *Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)*. Under *Rule 23*, a party may serve as a class representative "only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *FED.R.CIV.P. 23(a)*. In selecting the lead plaintiff under the PSLRA, however, typicality and adequacy of representation are the only relevant considerations. *Johnson v. Tellabs, Inc., 214 F.R.D. 225, 228 (N.D. Ill. 2002)* (citation omitted). A wide-ranging analysis of the *Rule 23* factors should be left for consideration of a motion for class certification. *Id.*

Under *Rule 23(a)*, the plaintiff's claims are typical if they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992)* [*11] (quotations omitted). To satisfy this requirement, the claims of the class representative need not be identical to those of other class members. Typicality exists even if there are some factual distinctions between the claims of the named plaintiff and those of other class members. *De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983)*. Here, for purposes or selecting the lead plaintiff, New Jersey satisfies the typicality requirement because it (1) purchased Motorola securities during the class period; (2) paid allegedly inflated prices because of claimed false and misleading statements by Motorola officials; and (3) thereby allegedly suffered damages. *Johnson, 214 F.R.D. at 228*.

To meet the adequacy requirement, the plaintiff must demonstrate that (1) his claims are not antagonistic or in conflict with those of the class; (2) he has sufficient interest in the outcome of the case to ensure zealous advocacy; (3) he is represented by competent, experienced counsel who will be able to prosecute the litigation vigorously. *Johnson, 214 F.R.D. at 228-29* (citations omitted). There is no evidence of a conflict between [*12] the interests of New Jersey and the purported class. Furthermore, New Jersey appears to have a substantial interest in the outcome of the case, and the State's choice of counsel seems competent and

Page 4

2003 U.S. Dist. LEXIS 12651, *; Fed. Sec. L. Rep. (CCH) P92,459

experienced. Wolf Popper LLP ("Wolf Popper") has frequently been appointed to serve as lead or co-lead counsel in complex, multi-party actions, including securities and antitrust actions, and Lite DePalma Greenberg & Rivas ("Lite DePalma")'s attorneys also have an impressive record in commercial and class action litigation (Firm Biographies of Wolf Popper LLP and Lite DePalma Greenberg & Rivas LLC, Exhibits E & F to Declaration of Lester L. Levy in Support of the State of New Jersey's Motion for Appointment as Lead Plaintiff.)

For purposes of selecting the lead plaintiff, New Jersey satisfies the typicality and adequacy requirements imposed by *Rule 23*. Therefore, absent a showing that New Jersey will not fairly and adequately represent the class, or is subject to unique defenses that will render the State incapable of representing the class, the court will grant New Jersey's motion.

Commerzbank claims it has made such a showing. Commerzbank argues that New Jersey will be an inadequate [*13] lead plaintiff because of alleged unique defenses that will be asserted by Motorola against the State. Commerzbank's principal objection is that, as described in two published articles, New Jersey officials have previously criticized the State's own Department of Investment, blaming it for losses suffered by the State in the falling stock market of the last few years. Commerzbank argues that Defendants will challenge New Jersey's claim for relief by arguing that it was the conduct of state officials that resulted in New Jersey's investment losses. To support this argument, Commerzbank has submitted articles from the *Wall Street Journal* and the *Bergen Record*. The *Wall Street Journal* article, dated December 19, 2002, does not mention Motorola or the fact that New Jersey invested in Motorola stock. The article reports that Governor Jim McGreevey said in an interview that the State's losses from its pension fund "are not a temporary aberration, but the result of poor management." (Ianthe Jeanne Dugan, "Fingers Point at New Jersey Fund: Pension Operation Racks Up Huge Losses Since Bubble Burst, Prompting Suits and Shake-Up," *Wall St. Journal*, Dec. 19, 2002, at C1, Ex. A [*14] to Commerzbank's Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions.) The article also notes, however, that he made this statement after announcing that the state was suing four major corporations "whose accounting practices allegedly cost the pension fund at least $ 150 million." *Id.*

The *Bergen Record* article reported that New Jersey planned to file lawsuits against four companies, but Motorola was not one of the companies listed. (Charles Stile, "State Suing Four Companies Over Pension Fund Losses; Alleged Overstating of Earnings Targeted," *Bergen Record*, Nov. 26, 2002, at A1, Ex. B to Commerzbank's Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions.) The article did not mention Governor McGreevey's criticisms of the state's pension fund managers. The article did report that New Jersey Attorney General David Samson had "established a pool of about a dozen private law firms that will be chosen to direct the litigation on a contingency basis . . . . Among the candidates are several firms that are closely allied to McGreevey, the Democratic Party, and Trenton's political establishment." [*15] *Id.* A sidebar appearing beside the article listed four law firms as having been recommended to handle litigation against corporations; the court notes that the firms representing New Jersey in this action do not appear on the list. *Id.*

Commerzbank argues that "whether or not the losses sustained by New Jersey were a result of Motorola's misconduct or New Jersey's mismanagement will be a major subject for dispute." (Commerzbank's Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions and in Further Support of the Motion of the Proposed Commerzbank Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and for Approval of Selection of Lead and Liaison Counsel, at 2.) Commerzbank contends that New Jersey's "concessions" and "public admissions" will present a wonderful opportunity for the defense to argue that the losses incurred by New Jersey were not the result of Motorola's own misfeasance, but due to their own poor investment practices. *Id.* at 3.)

The court is uncertain that these newspaper articles constitute "proof" that New Jersey's investors [*16] acted negligently with respect to Motorola securities. Even assuming Commerzbank has established the New Jersey investors were negligent, the court is not persuaded that this disqualifies New Jersey from acting as lead plaintiff here. Courts have repeatedly stated that contributory negligence is not a defense to an intentional or reckless tort such as securities fraud. *See Indosuez Carr Futures, Inc. v. Commodity Futures Trading Com'n, 27 F.3d 1260, 1265 (7th Cir. 1994); Siebel v. Scott, 725 F.2d 995, 1000 (5th Cir. 1984); Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir. 1983); Dupuy v. Dupuy, 551 F.2d 1005, 1018 (5th Cir. 1977), cert. denied,434 U.S. 911, 54 L. Ed. 2d 197, 98 S. Ct. 312; Xaphes v. Merrill, Lynch, Pierce, Fenner and Smith, 600 F. Supp. 692, 694 (D. Me. 1985).* Our Court of Appeals has stated "that a buyer's failure to exercise due care was not a defense in a *10b-5* case." *Indosuez Carr Futures, 27 F.3d at 1265*, citing *Sunstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1040 (7th Cir. 1977).* Rather, the [*17] buyer's actions must be at least reckless in order to constitute a defense. *Sunstrand, 553*

Case 5:03-cv-04003-JAR-JPO   Document 148-4   Filed 08/11/05   Page 9 of 14

Page 5
2003 U.S. Dist. LEXIS 12651, *; Fed. Sec. L. Rep. (CCH) P92,459

*F.2d at 1040.* Nothing in the referenced newspaper articles seems likely to lead to a unique defense.

Judge Lynch, who presides over the consolidated actions filed against Motorola in the Southern District of New York, commented in response to Commerzbank's argument, "there either was a fraud or there wasn't." (Transcript of Proceedings, *In re Koenemann*, S.D.N.Y., April 15, 2003, at 10.) In appointing New Jersey as lead plaintiff in the New York cases, Judge Lynch noted that if there was no fraud on Motorola's part, then no plaintiff will recover. If there was fraud, then all will presumably recover, unless there is evidence that any of them acted recklessly. Finally, as Judge Lynch aptly pointed out, if New Jersey's investment strategy during the early part of this decade was less than ideal, this actually may make the State more typical of those who have lost money in the stock market rather than less. (*Id.* at 11.) This court agrees with Judge Lynch that Commerzbank has not offered adequate support for its assertion that New Jersey is subject to unique defenses. Notably, [*18] in another securities fraud class action, another judge of this court has appointed the State of New Jersey as lead plaintiff, concluding that New Jersey officials' criticism of the State's own Department of Investment did not disqualify New Jersey. *See Craig v. Sears, Roebuck & Co.*, 253 F. Supp.2d 1046, 1048 (N.D. Ill. 2003).

Nor is the court moved by Commerzbank's charge that a conflict of interest precludes New Jersey from acting as lead plaintiff. Commerzbank notes that the *Bergen Record* reported that the McGreevey Administration considered hiring law firms to represent the State in securities litigation that made political contributions to the governor. (Charles Stile, "State Suing Four Companies Over Pension Fund Losses; Alleged Overstating of Earnings Targeted," *Bergen Record*, Nov. 26, 2002, at A1, Ex. B to Commerzbank's Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions.) As the court previously noted, the article made no mention of the litigation against Motorola, nor did it name either Lite DePalma or Wolf Popper, the two firms that were selected by the State to represent it in this action. Furthermore, Lester L. Levy and Allyn [*19] Z. Lite, senior partners at Wolf Popper and Lite DePalma, respectively, submitted a Joint Declaration to the court denying that New Jersey retained the two firms as a reward for political contributions made to Governor McGreevey. (Joint Declaration of Levy and Lite in Further Support of New Jersey's Motion to be Appointed Lead Plaintiff and in Opposition to Commerzbank AG's Opposing Motion to be Appointed Lead Plaintiff P 1.) The attorneys have sworn that neither firm nor any of the attorneys at the firms made or caused others to make political contributions to the governor of New Jersey. (*Id.* P 2.) Commerzbank's unsupported assertion to the contrary does not merit further discussion.

Neither Commerzbank nor the Local 710 Funds has offered sufficient proof against New Jersey, and therefore the court grants New Jersey's motion for appointment as lead plaintiff.

## II. Appointment of Lead Counsel

The PSLRA permits the lead plaintiff to "select and retain counsel to represent the class . . . subject to the approval of the court." *15 U.S.C. § 78u-4(a)(3)(B)(v)*. New Jersey has selected Lite DePalma and Wolf Popper as co-counsel to represent the class [*20] in this action. Both firms have substantial experience in securities class action litigation. (Firm Biographies of Wolf Popper LLP and Lite DePalma Greenberg & Rivas LLC, Exhibits E & F to Declaration of Lester L. Levy in Support of the State of New Jersey's Motion for Appointment as Lead Plaintiff.)

The court has also received assurances from New Jersey State Treasurer John McCormac that steps have been taken to ensure that attorneys' fees paid to the law firms will be fair and reasonable under the circumstances. The fee agreement provides for varying percentages for attorneys' fees depending on the amount recovered and the stage of the proceeding, and the court has been informed that the amounts are "significantly below the 25% - 30% range that are often awarded in these types of cases." n4 (Declaration and Certification of John E. McCormac in Support of New Jersey's Motion to be Appointed Lead Plaintiff, and for Approval of its Selection of Lead Counsel, at P 10.) Because the proposed fees suggested by the firms do not appear unreasonable, the court approves New Jersey's selection of lead counsel. At the conclusion of the litigation, of course, the court will carefully scrutinize [*21] any proposed fee award and will approve only a reasonable fee. *15 U.S.C. § 78u-4(a)(6)* (limiting the total award of attorneys' fees and expenses to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

---

n4 To confirm this conclusion, the court will accept New Jersey's offer to disclose the agreement to the court for *in camera* review.

---

## CONCLUSION

The court grants New Jersey's motion for consolidation, appointment as lead plaintiff, and the appointment of Lite DePalma and Wolf Popper as lead co-counsel. The court is aware that there may be a motion to transfer the cases from the Southern District of

Case 5:03-cv-04003-JAR-JPO   Document 148-4   Filed 08/11/05   Page 10 of 14

Page 6

2003 U.S. Dist. LEXIS 12651, *; Fed. Sec. L. Rep. (CCH) P92,459

New York to this court, and is willing to accept such cases, as well as any other related securities law challenges.

ENTER:

Dated: July 16, 2003

REBECCA R. PALLMEYER

United States District Judge



# SECURITIES FRAUD MONITOR

Spring 2004

BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO

## Public Fund Premium in Securities Litigation Greater Than Previously Believed, Study Shows

*By Michael J. Pucillo*

For years, plaintiffs' securities lawyers have been telling public pension funds they can make a difference by getting involved in shareholder litigation. Now there are some remarkable numbers to back up this position.

A recent PricewaterhouseCoopers study found that the dollar values of settlements soar when public funds are lead plaintiffs in securities fraud class actions. The report also showed a steady increase in the number of public funds taking the lead in such cases.

The findings provide added proof that the lead plaintiff provisions of the Private Securities Litigation Reform Act of 1995 (PSLRA) are bearing fruit. By enacting the PSLRA, Congress sought to put shareholder lawsuits in the hands of sophisticated institutional investors instead of the first shareholder to reach the courthouse.

The PricewaterhouseCoopers report examined more than 240 settlements reached from the time the PSLRA took effect in 1996 through Nov. 6, 2003. During that period, the 50 cases led by municipal, state or union pension funds settled for an average of $87 million, more than six times the $13 million average for 190 settlements in which public funds were not involved. The difference grew last year, with settlements reached by public funds averaging $120 million – 16 times the $7.5 million average for other cases.

These numbers do not include the case against Cendant Corp., where the nation's three biggest pension funds settled for a record $3.2 billion in 1999.

The new study's authors attribute the staggering difference in settlement amounts partly to the types of securities fraud cases public funds choose to prosecute. More than four in five involve allegations of serious accounting violations, cases that tend to settle

*Continued on page 7*

### Martha's Misfortune

Oh, Martha, poor Martha, how far you have fallen.

This was an unforgettable passion play. Day after day, the nation watched the trial grind towards the inevitable conclusion that Martha Stewart and her broker, Peter Bacanovic, had lied about her sale of ImClone stock. The hubristic decision to lie was so foolish. Yet it was also emblematic of imperial decisions made by corrupt corporate titans who believe themselves above "the little people." Her attorneys had little chance to appeal to the sympathies of a jury peering at her through the wreckage of 401(k) plans trashed by Enron, WorldCom and the like.

The sad truth is that the stock sales saved her only $51,000 and the government's case against her was too weak to even indict her for insider trading. Now she is a convicted felon, prohibited from serving on the board of her own company, and she has lost hundreds of millions of dollars as the company's prospects faded with her tarnished image.

Kozlowski, Swartz, the Rigas family and the rest, the true masters of the art of looting the fraudulently fattened corporate till, are twisting slowly in the wind, as they richly deserve. You don't belong there, Martha, but it's never a good idea to lie to the feds. That's why Arthur Andersen is out of business, and Martha Stewart Living is no longer in style. ■

– *Peter A. Pease*

### INSIDE

| | |
|---|---|
| Accounting for Change | 2 |
| A Tool for Reform | 3 |
| Good Governance | 6 |
| Mutual Fund Politics | 8 |

## EDITORIAL

# Kudos to the Accounting Oversight Board

Three cheers for the Public Company Accounting Oversight Board, the agency created to improve corporate accounting. In one of its first regulatory decisions, the PCAOB stood up to corporate pressure and approved strict new standards for auditing a company's internal controls.

Under a standard unanimously approved March 9, the PCAOB will require a company's outside auditors to independently verify that the company has adequate and proper internal controls to govern its financial reporting and operational efficiency.

Business groups lobbied hard against the measure, arguing that it would cost them too much money. But the PCAOB stood its ground – and, simultaneously, stood by shareholders.

Kayla Gillan, a PCAOB member and the former general counsel to the California Public Employees' Retirement System, chastised the opponents for wanting a "simple rubber stamp on management's own assessment of the effectiveness of these controls." Gillen continued: "This mentality epitomized, to me, the very attitude that resulted in many of the corporate scandals that are still shaking investor confidence."

The measure, which requires Securities and Exchange Commission approval, should go far in boosting the spirits of downtrodden investors.

To understand the significance of the PCAOB's vote against Big Business, one need only contrast it with the SEC's proposal allowing shareholders to nominate competing directors. The proposal, which could have offered a giant leap toward boardroom reform, is, at best, a modest step forward for shareholders. Filled with so-called "triggers," the proposed rule will allow major shareholders to propose candidates to the board – but only after a long process and two votes from ownership.

Wall Street, nonetheless, is fighting it tooth and nail, with the U.S. Chamber of Commerce even threatening to sue. Clearly, the corporate cries of foul have already had an effect on the deeply divided SEC. The agency has received more letters on this rule – 13,000 and growing – than on any other in its history.

Also writing the SEC was a group of 11 state and local pension fund officials representing assets of more than $640 billion. They said the agency has squandered an "opportunity for meaningful and lasting reform."

Speaking to state treasurers in March, SEC Commissioner Harvey Goldschmid said the compromise measure is the best investors can hope for in the current climate, in which reform-weary CEOs see any independent voice as dissent.

Victorious or not, shareholder activists have no time to rest. They are already bracing for the next regulatory battle – and it should be a doozy. The Financial Accounting Standards Board has announced its intention to require public companies to assign a value to stock options they award their employees and report those options as expenses.

The logic of such a rule is compelling. As investor advocates have so often pointed out: if stock options are not expenses, what are they? But that won't stop corporate America from mounting a mammoth attack on the proposal as anti-business and anti-growth. A decade ago, pressure from business forced FASB to abandon a similar proposal. Let's hope times have changed enough to let the regulators do their job. ■

---

### BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO

Berman DeValerio Pease Tabacco Burt & Pucillo prosecutes class actions nationwide on behalf of institutions and individuals, chiefly victims of securities fraud and antitrust law violations. The firm, which was founded in 1982, has offices in Boston, San Francisco and West Palm Beach. In addition to conducting litigation, the firm provides securities fraud monitoring, evaluation and advisory services to public pension funds and other institutional investors.

The Securities Fraud Monitor is published quarterly by the law firm of Berman DeValerio Pease Tabacco Burt & Pucillo, One Liberty Square, Boston, MA 02109, (800) 516-9926. This newsletter is designed to inform Berman DeValerio's clients and friends about current securities fraud and corporate governance issues. It is not a substitute for legal advice.

If you would like to receive additional copies of this issue, or if you would like to be added to our mailing list for future issues, please contact Richard Lorant, Director of Marketing & Communications, at (617) 646-1825 or rlorant@bermanesq.com.

Peter A. Pease, *Executive Editor*
Richard Lorant, *Managing Editor*

Copyright 2004
Berman DeValerio Pease Tabacco Burt & Pucillo
www.bermanesq.com

# Public Fund Premium

Continued from page 1

for more money. Public funds also are attracted to higher profile frauds at bigger companies, where institutions hold large positions. Cases against large companies with more resources are likely to result in larger settlements than those against smaller companies for many reasons.

Still, public fund plaintiffs clearly increase the bottom line at settlement time. Whom would you rather face, if you were a lawyer defending a company against fraud charges: an individual investor who lost $25,000 or a state retirement system with millions in damages and a penchant for corporate reform?

Even if public funds do limit their involvement to the strongest cases, all investors reap major gains from their role in securities litigation. That is because growing settlement amounts are only one of three benefits public pension funds bring to the table.

In addition to larger settlements, public fund plaintiffs have sharply reduced the percentage of the settlement pool that goes to the lawyers who represent them in securities class actions. In cases where individual investors act as lead plaintiffs, contingent fees have historically ranged up to 33%. But institutional plaintiffs have the sophistication and the commitment to the class they represent to negotiate significantly lower fees.

Institutions look for ways to ensure that attorney fees are reasonable and reflect the results obtained, as well as the time and effort expended. Their fee agreements often include anti-windfall provisions and other incentives that tie the lawyers' share to the size of the recovery and the length of the proceedings.



Top Ten Securities Settlements

The New York State Common Retirement System last year issued a Request for Proposals in which all responding securities litigation counsel agreed to a fee scale that set fees of 8%-14% for settlements under $100 million. Larger settlements are governed by a multi-tier system that lowers the percentage even more. Other funds have come up with similar formulas to keep legal fees reasonable, providing a valuable service not only to their plan members but also to the wider pool of shareholders entitled to part of the settlement.

The third benefit from institutional investor participation is the use of securities class action settlements to achieve corporate governance reform. Including corporate governance provisions in settlements was largely unknown until a few years ago. In one early example, my firm negotiated a 1999 settlement in the UCAR International fraud case that allowed our client, the Florida State Board of Administration, to appoint a member to the company's board of directors.

Recent settlements with HealthSouth, Enterasys, Sprint and others testify to the growing number of lawsuits in which meaningful corporate governance reform is incorporated in settlements. In the last year alone, settlements have overhauled the structures of several notorious companies, forcing changes in everything from board of director composition to compensation disclosure requirements.

Substantially larger settlements. Lower attorney fees. Enhanced corporate governance. Add them together and you get an improved model for litigating securities fraud class actions. As long as public pension funds continue to press these important issues in litigation, all investors in our capital markets will benefit.

But institutions cannot rest on their laurels. It took years and an unprecedented string of corporate accounting scandals for a critical mass of public funds to grasp the reins of securities litigation. For the new model to become the norm, more public funds will need to become involved and those funds that have played an active role in the past will need to continue their constructive approach to securities fraud litigation. ■

The request for exclusion must state: (1) your name, address, and telephone number; and (2) all purchases and sales of TXU securities made during the Settlement Class Period, including the dates of purchase or sale, the type of securities and the number of shares of such securities purchased or sold and the price paid or received per share and documentation in support thereof. YOUR EXCLUSION REQUEST MUST BE POSTMARKED ON OR BEFORE JUNE 1, 2005, AND, IN ORDER TO BE VALID, MUST CONTAIN ALL OF THE FOREGOING INFORMATION. IF YOU SUBMIT A VALID AND TIMELY REQUEST FOR EXCLUSION, YOU SHALL HAVE NO RIGHTS UNDER THE SETTLEMENT, SHALL NOT SHARE IN THE DISTRIBUTION OF THE NET SETTLEMENT FUND, AND SHALL NOT BE BOUND BY THE STIPULATION OR THE FINAL JUDGMENT.

## X. DISMISSAL AND RELEASES

If the Settlement is approved, the Court will enter a Final Judgment in the Litigation. The Final Judgment will dismiss the Released Claims with prejudice as to all Defendants.

The Final Judgment will also provide that all Members who have not validly and timely requested to be excluded from the Settlement Class shall be deemed to have released and forever discharged all Released Claims (to the extent Members have such claims) against all Released Parties.

## XI. APPLICATION FOR FEES AND EXPENSES

At the Settlement Hearing, Co-Lead Plaintiffs' Counsel will request the Court to award attorneys' fees of up to 22.2% of the Settlement Fund, plus reimbursement of expenses, not to exceed $750,000, which were incurred in connection with the Litigation, plus interest thereon. The court-appointed Lead Plaintiffs support this application. In addition, certain of Lead Plaintiffs in the Action may seek compensation for their expenses incurred (including lost wages) in prosecuting the Action. This compensation will be paid from the Settlement Fund. Members are not personally liable for any such fees or expenses.

## XII. CONDITIONS FOR SETTLEMENT

The Settlement is conditioned upon the occurrence of certain events described in the Stipulation. Those events include, among other things: (1) entry of the Final Judgment by the Court as provided for in the Stipulation; and (2) expiration of the time to appeal from or alter or amend the Final Judgment. In addition, TXU has the right to terminate the Settlement should requests for exclusion exceed a certain threshold. If, for any reason, any one of the conditions described in the Stipulation is not met, the Stipulation might be terminated and, if terminated, would become null and void, and the parties to the Stipulation will be restored to their respective positions as of January 19, 2005.

## XIII. THE RIGHT TO BE HEARD AT THE SETTLEMENT HEARING

Any Member who has not validly and timely requested to be excluded from the Settlement Class, and who objects to any aspect of the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses, may appear and be heard at the Settlement Hearing. Any such person must file a written notice of objection with the Clerk of the Court and serve on each of the following, by hand or first class mail, on or before June 1, 2005:

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
1100 Commerce Street
Dallas, TX 75242

and

| | |
|---|---|
| LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP<br>DARREN J. ROBBINS<br>MARK SOLOMON<br>ELLEN GUSIKOFF STEWART<br>401 B Street, Suite 1600<br>San Diego, CA 92101 | ORRICK, HERRINGTON & SUTCLIFFE LLP<br>ROBERT P. VARIAN<br>The Orrick Bldg., 405 Howard Street<br>San Francisco, CA 94105 |
| PROVOST & UMPHREY LAW FIRM, LLP<br>JOE KENDALL<br>3232 McKinney Avenue, Suite 700<br>Dallas, TX 75204<br>Co-Lead Counsel for Plaintiffs | DAVID P. POOLE<br>TXU LEGAL<br>1601 Bryan Street, Suite 2100<br>Dallas, TX 75201<br>Counsel for the TXU Defendants |

Any such written objection must demonstrate the objecting person's membership in the Settlement Class, including documentation of the number and type of TXU securities purchased and sold during the Settlement Class Period, and contain a statement of the reasons for objection. Only Members who have submitted written notices of objection in this manner will be entitled to be heard at the Settlement Hearing, unless the Court orders otherwise.